UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE № 22-20030-CR-MORENO

UNITED STATES OF AMERICA,

        *Plaintiff*,

v.

ALEJANDRO ALVAREZ,

        *Defendant*.

_____/

## ALEJANDRO ALVAREZ'S SENTENCING MEMORANDUM

ALEJANDRO ALVAREZ ("MR. ALVAREZ"), through undersigned counsel, respectfully

submits this Sentencing Memorandum, pursuant to 18 U.S.C. § 3553(a), and the dictates

of *United States v. Booker*, 543 U.S. 220 (2005), and its progeny. In support thereof, MR.

ALVAREZ submits the following[1]:

### I.
### INTRODUCTION

I take full responsibility for my crime and actions. As such, I know my actions
have repercussions and for that I am ready to face my consequences. I am
aware that I have broken the law and am willing to do anything and
everything to right this wrong. Some of the work started while I was out on
bond and I will continue to do all the work necessary. The only way to do
better is to be better. I whole heartedly apologize for my actions that have
led me to this point. Words cannot describe the overwhelming sense of guilt
I have, and carry, for what I have done. I cannot properly put into words the
deepest sincerest apology I have to offer the Court, family, friends, and
victims. To the victims, I truly apologize for the pain and trauma my actions
have caused you. I wish none of this had happened to you or anyone. The
depictions of your exploitation should not be accessible to anyone, much
less exist. If I could take away any of the pain and suffering this crime has

---

[1]      Contemporaneous with the filing of this Sentencing Memorandum we are filing as
letters we received in support of MR. ALVAREZ'S sentencing. Passages from a select number of
those letters are incorporated herein.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

laid upon you, I would do it in heartbeat. I am so sorry. I will do everything in my power to grow from my new reality. I do not want my past transgressions to be indicative of my future.

Statement of Acceptance of Responsibility, PSR ¶ 31.   MR. ALVAREZ readily acknowledges the seriousness and wrongfulness of his conduct, for which he will serve a significant amount of time in custody.[2]   There is no dispute among the parties or probation that the applicable guidelines range for MR. ALVAREZ'S offense is 151–188 months.[3]   We respectfully submit, however, that a substantial downward variance is warranted to ensure that the sentence imposed by the Court is "sufficient but not greater than necessary" to achieve the purposes of sentencing.

In support of a below guidelines sentence, we first ask this Court to consider MR. ALVAREZ'S history and characteristics, in particular his traumatic history of childhood sexual abuse, medical conditions, and service to others.  Next, we request that this Court consider the nature and circumstances of the offense, the guidelines application in the instant case, and sentences imposed nationally for similar offenses.  Finally, in fashioning a sentence, this Court should give ample weight to MR. ALVAREZ'S substantial cooperation and acceptance of responsibility, his receptiveness to treatment, profound remorse for his actions, extraordinarily strong support system, and unique susceptibility to victimization in prison.

---

[2]     18 U.S.C. § 2252(a)(2) carries a five (5) year mandatory minimum sentence.
[3]     The Presentence Investigation Report ("PSR") calculates MR. ALVAREZ'S applicable guidelines at 151–188 months based upon a total offense level of thirty-four (34) and a criminal history category I.  MR. ALVAREZ concedes that the PSR contains an accurate calculation of the applicable enhancements and his guidelines.

## II.
## HISTORY AND CHARACTERISTICS OF MR. ALVAREZ

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Pepper v. United States*, 562 U.S. 476, 487 (2011).  "[H]ighly relevant—if not essential—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* (citing *Williams v. New York*, 337 U.S. 241, 247 (1949)).  Consideration of the widest breadth of information "ensures that the punishment will suit not merely the offense but the individual defendant." *Id.* (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

### A.
### EARLY LIFE, HISTORY OF ABUSE, AND MENTAL HEALTH CONDITIONS

MR. ALVAREZ is the first of three (3) children born to Astrid Alvarez and Manuel Romualdo Alvarez.  Growing up, MR. ALVAREZ and his younger sisters, Cristina and Jessica, shared a close and loving relationship.  However, behind closed doors, Astrid sheltered and protected her children from their father, who was suffering from alcoholism. Fed up with the horrors that accompanied his substance abuse, Astrid determined to provide a safe and stable environment for her children, and so she filed for divorce.  From that moment on, MR. ALVAREZ'S father decided to have little to no contact with MR. ALVAREZ or his siblings.  MR. ALVAREZ was only nine (9) years old when he began to fill the void that his father's absence had created for his family.  His sister, Jessica, recounts MR. ALVAREZ'S impact in her life:

> Through his selfless actions of caring for my sister and me, from ensuring we had a cooked meal on the table every night to being a protector, *my brother taught me that love existed beyond a parental figure.* Throughout childhood and until now, he has always been a constant presence of comfort and love.

(emphasis added). While Astrid worked long hours and weekends to make ends meet, MR. ALVAREZ cared for his sisters, helping with homework, cooking meals, and cleaning their home. Ultimately, the family struggled without financial assistance from MR. ALVAREZ'S father, and they lost their home to foreclosure.

Shortly after separating from MR. ALVAREZ'S father, Astrid became involved in a relationship that lasted nearly a decade. For the next four (4) years, Astrid's significant other gained the trust of the Alvarez family, joining the family on holidays, dinners, and at school events. Most significantly, for nearly four (4) years, he served as a father figure to MR. ALVAREZ, a relationship he so desperately craved due to his father's absence. But he had his own agenda with MR. ALVAREZ. After nearly four (4) years of insinuating himself into the Alvarez family, the very man that MR. ALVAREZ looked to for guidance and support began to routinely and severely sexually abuse MR. ALVAREZ—unrelenting abuse that lasted for five (5) years.

The abuse began when MR. ALVAREZ was only twelve (12) years old and did not end until he left for college. In other words, the abuse did not end until MR. ALVAREZ removed himself from the family home altogether. At first, he calculatedly disguised the abuse by telling MR. ALVAREZ that he needed to check that MR. ALVAREZ was "growing properly" after MR. ALVAREZ was discharged from the hospital following an emergency room visit. While he was "checking up" on MR. ALVAREZ, he forced MR. ALVAREZ to

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

measure their penises against one another and compete to see who could ejaculate quicker. He sexually battered **MR. ALVAREZ** frequently, touching and masturbating him to the point of ejaculation. He demanded the same of **MR. ALVAREZ**. He forced **MR. ALVAREZ** to touch him sexually repeatedly and to perform oral sex on him on several occasions. The abuse took place several times per month. During the recurring incidents of sexual abuse, he introduced and forced **MR. ALVAREZ** to watch child pornography.

For over twenty (20) years, **MR. ALVAREZ** kept the abuse from his family and friends. In fact, **MR. ALVAREZ'S** family, including his mother, learned of the abuse for the first time as a result of the instant case. At the time the abuse was occurring, **MR. ALVAREZ** was scared that he would be blamed for the abuse, and he did not want to jeopardize his mother's relationship, particularly in light of the financial support his abuser was providing to the family after the divorce.[4] As a result, for over twenty (20) years, **MR. ALVAREZ** shouldered the weight of his child sexual abuse *alone*, resorting to unhealthy coping mechanisms.[5] **MR. ALVAREZ'S** mother wrote a letter to this Court regarding his abuse:

> Alejandro had a very hard childhood. Harder than I ever knew. Before Alejandro was taken to prison, he told us about what my ex-boyfriend did to him when he was just a child. Alejandro wanted us to find out from him, and not his lawyers or anyone else. I will never forgive myself for bringing this

---

[4]     Melissa Hall & Joshua Hall, *The Long-Term Effects of Childhood Sexual Abuse: Counseling Implications* 2-3 (2011) ("When the sexual abuse is done by an esteemed trusted adult it may be hard for the children to view the perpetrator in a negative light, thus leaving them incapable of seeing what happened as not their fault. Survivors often blame themselves and internalize negative messages about themselves.").

[5]     *Id.* at 5 (citations omitted) ("[A] first step in sexual healing is to help the survivor connect their current sexual problems with their past sexual abuse. . . . Ratican (1992) describes the sexual symptoms of survivors to often include sexualizing relationships, inappropriate seduction, difficulties with affection and intimacy, compulsive sexual behavior, promiscuity, problems concerning desire, arousal, and orgasm, flashbacks, [and] difficulties with touch . . . .").

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

person into our home. I divorced their father because I was trying to protect my children. I will never forgive myself for not knowing what was happening. I wish Alejandro told me. I know he never told me because he saw how much I was struggling and how much we were struggling as a family. This person took advantage of this.

Despite the ongoing and traumatic sexual abuse, **MR. ALVAREZ** still managed to be a successful student.  Indeed, **MR. ALVAREZ** excelled throughout high school, graduating with honors and holding several leadership positions in extracurricular activities.  His sister, Jessica, recounts that, "he was recognized for his superb character, integrity, and commitment to the community by receiving the 'Hall of Fame Award,' an award that only honors one male and one female student in the entire graduating class."

After graduating high school, **MR. ALVAREZ** attended Florida State University ("FSU"), where he planned to double major in history and political science.  However, **MR. ALVAREZ** soon began to experience symptoms of emotional and mental distress.[6]  Rather than seeking help initially, **MR. ALVAREZ** self-medicated with alcohol and drugs to cope.  Specifically, **MR. ALVAREZ** experimented with and abused of alcohol, marijuana, cocaine, ecstasy, mushrooms, and acid.  After years of childhood sexual abuse, **MR. ALVAREZ'S** mental health was in an extremely fragile place while at FSU.

Eventually, **MR. ALVAREZ** availed himself of FSU's free therapy program, where he was diagnosed with depression and general anxiety disorder.  The therapist referred **MR. ALVAREZ** to a psychiatrist after he had exhausted his eight (8) free sessions.  Ultimately,

---

[6]      Hall & Hall, *supra* note 4, at 2 ("Childhood sexual abuse has been correlated with higher levels of depression, guilty, shame, self-blame, eating disorders, somatic concerns, anxiety, dissociative patterns, repression, denial, sexual problems, and relationship problems.").

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

MR. ALVAREZ was unable to seek the services of a psychiatrist and was forced to take medical leave from the university after his mental health took a toll on his education. Determined to get back on the right track, MR. ALVAREZ appealed his expulsion, engaged with the university's therapist for another eight (8) free sessions, and was placed on academic probation.  While MR. ALVAREZ was motivated to succeed, his mental health issues persisted, resulting in frequent anxiety and panic attacks that left him hospitalized. As a result, MR. ALVAREZ dropped out of the university before completing his degree.

After returning to Miami, MR. ALVAREZ continued to use drugs and alcohol as a coping mechanism.  It wasn't until he suffered a severe panic attack that again resulted in hospitalization that MR. ALVAREZ sought the help of a therapist on his own.  Michael McCarthy, LCSW, treated MR. ALVAREZ for about a year before the pandemic disrupted their sessions.  Since his arrest, MR. ALVAREZ has received his Court-ordered substance abuse and mental health counseling from Mr. McCarthy.  Mr. McCarthy opined on the connection between MR. ALVAREZ'S history of child sexual abuse and substance abuse:

> He had great difficulty even mentioning the subject [of sexual abuse] without becoming emotionally flooded and unable to go into details. I believe his shame related to this to be a contributing factor to his substance abuse and ultimately to a range of choices over time that he made that proved destructive to the life he imagined himself to one day have.

Dr. Eric A. Imhof, Psy.D., conducted a psychological evaluation and risk assessment of MR. ALVAREZ, which included an extensive clinical interview and various objective psychological testing instruments.  A copy of Dr. Imhof's evaluation is attached hereto and incorporated by reference herein as Exhibit № 1. Dr. Imhof's report reveals the many ways in which MR. ALVAREZ'S past abuse has impacted his life.  Dr. Imhof

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

concluded that **MR. ALVAREZ** meets the criteria for Major Depressive Disorder; Generalized Anxiety Disorder with panic attacks; Alcohol Use Disorder; and Stimulant (Cocaine) Use Disorder.  Imhof at 7. These clinical conclusions are consistent with the diagnoses that **MR. ALVAREZ** previously received from both Mr. McCarthy and FSU.

Dr. Imhof reports that an objective evaluation of **MR. ALVAREZ** revealed significant emotional distress, with features of Posttraumatic Stress Disorder.  *Id.* at 4.  As a result, Dr. Imhof observed that **MR. ALVAREZ** likely uses substances as a form of self-medicating his intrusive thoughts, depression, and anxiety.  *Id.*  A further objective evaluation indicated that **MR. ALVAREZ** experiences "nightmares, flashbacks (i.e., sudden intrusive sensory memories of a prior traumatic event), upsetting memories that are easily triggered by current events, and repetitive thoughts of an unpleasant previous experience that intrude into awareness."  *Id.*  Dr. Imhof observed that **MR. ALVAREZ'S** approach to interpersonal relationships, such as fears of abandonment, rejection, and low self-worth, is often the result of early childhood sexual abuse.  *Id.* at 5.  Ultimately, Dr. Imhof concluded that **MR. ALVAREZ'S** history of childhood trauma, including his exposure to pornography and sexual victimization, are related to **MR. ALVAREZ'S** "poor sense of identity, reliance on others, and poor sexual boundaries which made him vulnerable to manipulations by others and ultimately contributed to the offense behavior."  *Id.* at 7.

We respectfully submit that **MR. ALVAREZ'S** tragic history of child sexual abuse warrants a variance from the guidelines range, and we respectfully request that the Court order mental health and substance abuse treatment, specifically the Bureau of Prison ("BOP")'s Residential Drug Abuse Program, in addition to any term of imprisonment. In

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

*United States v. McBride*, the district court imposed a sentence of eighty-four (84) months, even though the defendant's guidelines range was 151–188 months.[7]  *United States v. McBride*, 511 F.3d 1293, 1295 (11th Cir. 2007).   When arriving at the sentence, the district court considered the defendant's history of abuse, which included, among other things, sexual abuse at the hands of the defendant's grandfather for many years.  *Id.* Even though McBride had a lengthy history of physical contact with minors, including two (2) prior juvenile convictions for lewd acts on a child and admissions of more than five (5) acts of sexual contact with minors during polygraph examinations, the district court concluded that an eighty-four (84) month sentence was sufficient to protect the public.  *Id.* at 1296–98.   The Eleventh Circuit affirmed the district court's sentence below the guidelines range, reasoning that the sentence "exceed[ed] the statutory maximum by some years" and found no error in the district court's application of the § 3553 factors in arriving at its sentence.  *Id.*  at 1298; *see also* Transcript of Sentencing Hearing, *United States v. DeMarco*, Case No. 10-20261-CR-MOORE/TORRES (Oct. 6, 2011) (May 17, 2017) (imposing a sentence of sixty (60) months when the defendant's guidelines were 151–188 months, because the "evidence of psychological abuse earlier in life . . . counseled in favor of a variance.") (Page 8, Lines 7–8).

**B.**
**MEDICAL CONDITIONS**

     **MR. ALVAREZ** suffers from multiple serious physical ailments that also warrant a

---

[7]     The defendant's guidelines are identical to **MR. ALVAREZ'S** guidelines in every respect, including base offense level, enhancements, and criminal history category.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

variance from the guidelines range.  As documented in the PSR, and supported by medical records, MR. ALVAREZ has been diagnosed with, among other things: (1) human immunodeficiency virus ("HIV"); (2) antiphospholipid syndrome ("APS"); and (3) hypertriglyceridemia/hyperlipidemia.  We respectfully submit that MR. ALVAREZ'S significant medical issues, and the requisite level of care and medical attention to treat the same, support a sentence below the guidelines range.

MR. ALVAREZ was diagnosed with HIV in 2020, and prescribed a daily dose of Biktarvy.  HIV is a virus that attacks the body's immune system, and unless it is adequately treated, HIV can develop into acquired immunodeficiency syndrome ("AIDS"), which has a life expectancy of up to three (3) years.[8]  Proper management of HIV requires regular bloodwork to assess the efficacy of antiretroviral therapy, physical examinations, and specialized evaluations for HIV-related complications.

MR. ALVAREZ was diagnosed with APS in 2018 after developing acute deep vein thrombosis that necessitated emergency treatment. He was prescribed a daily anticoagulant, Rivaroxaban.  APS is a rare autoimmune disorder in which "the immune system mistakenly creates antibodies that attack tissues in the body" and "causes blood clots to form in arteries and veins."[9]  MR. ALVAREZ'S APS requires regular bloodwork and monitoring.  At FDC Miami, MR. ALVAREZ has been prescribed a different anticoagulant,

---

[8]     Centers for Disease Control and Prevention, ABOUT HIV (June 30, 2022), https://www.cdc.gov/hiv/basics/whatishiv.html.

[9]     Mayo Clinic, ANTIPHOSPHOLIPID SYNDROME (Feb. 25, 2022), https://www.mayoclinic.org/diseases-conditions/antiphospholipid-syndrome/symptoms-causes/syc-20355831.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

Apixaban, without any consultation with a medical professional or laboratory bloodwork. Moreover, since **MR. ALVAREZ'S** remand on June 22, 2022, **MR. ALVAREZ** has neither met with a physician nor undergone laboratory bloodwork to determine whether Apixaban is effectively treating his APS.[10]  In fact, it is our understanding that inmate laboratory bloodwork has been suspended at FDC Miami for the foreseeable future.

If not properly treated, APS can cause, most acutely, strokes, heart attacks, deep vein thrombosis, pulmonary embolism, and kidney damage.[11]  APS can also lead to myriad other health complications, including arthralgia, or joint pain.[12] **MR. ALVAREZ** is currently suffering from severe knee pain at FDC Miami, and although he was prescribed Duloxetine to treat the pain itself, he has not seen a physician, *e.g.*, a hematologist or orthopedic surgeon, to determine the cause of the pain, which may be related to his APS.

Maureen P. Baird, a former warden for the BOP whose career there spanned over twenty-seven (27) years and multiple institutions, avers that **MR. ALVAREZ'S** two autoimmune disorders, along with his mental health conditions, will be difficult to treat in any prison setting, which "will make his incarceration hasher than that of a healthier inmate."  Baird Decl. ¶ 13.  A copy of Maureen Baird's declaration is attached hereto and incorporated by reference herein as Exhibit № 2.  For example, Ms. Baird opines that

---

[10]     The undersigned has made multiple attempts to inform BOP of **MR. ALVAREZ'S** medical conditions and required care, through letters, emails, and production of medical records.
[11]     *What is Antiphospholipid Syndrome*, U. of Mich. Health, https://www.uofmhealth.org/conditions-treatments/rheumatology/antiphospholipid-syndrome ("[APS] can lead to serious, even life-threatening health problems.").
[12]     *Bones and Joints*, APS Support UK, https://aps-support.org.uk/about-aps/what-are-the-symptoms/bones-and-joints (noting arthralgia is "relatively common in APS patients").

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

"MR. ALVAREZ may be unable to access regular medical appointments that he needs to ensure that his autoimmune disorders are being properly managed." *Id.* ¶¶ 14–16. Further, Ms. Baird stresses that, given their weakened immune systems, inmates with HIV are at heightened risk for infectious disease, like COVID-19 and Monkeypox, and opportunistic infections, like MRSA.[13]  *Id.* ¶¶ 17–18.

As the BOP itself recognizes, MR. ALVAREZ'S HIV and APS both require a heightened level of care.[14] This is particularly so during a pandemic, such as the ongoing COVID-19 pandemic, when MR. ALVAREZ is at greater risk of serious illness or death given his medical vulnerabilities.  Accordingly, we urge this Court to consider MR. ALVAREZ'S serious physical ailments, and their requisite level of care, in determining that a downward variance is appropriate.

## C.
### SERVICE TO OTHERS

Although MR. ALVAREZ was in desperate need of care and healing for so long, it was *he* who always served as a source of comfort for others. Despite his fragile mental and physical health, MR. ALVAREZ has spent his life selflessly placing the needs of others before his own.  In addition to the support MR. ALVAREZ has provided his immediate family, a clear theme that emerges from the numerous letters of support filed on behalf of MR. ALVAREZ is that he is, and has always been, a loyal, kind, and compassionate human

---

[13]     *See* BOP, HIV Management 10, 13 (Apr. 2021), https://www.bop.gov/resources/pdfs/hiv_infection_management_20210427.pdf.
[14]     *See* BOP, National Formulary: Part I 44 (Oct. 2020) (including "HIV infection" and "anyone taking . . . blood thinners" on list of "High priority Medical Conditions/Diagnoses").

being who is keenly aware of the community around him and the needs of others.

For example, his cousin, Patricia Pickens-Rojas writes that after the loss her daughter in March 2021, **MR. ALVAREZ** guided her through the anxiety and depression: "Alejandro took the time to show me ways to heal and took time to come up from Miami to Orlando to support me.  His love and kindness helped me move forward . . . ."  **MR. ALVAREZ'S** cousin and Patricia's husband, Carlos D. Rojas, adds that **MR. ALVAREZ** not only offered them emotional support, but also helped them pay for funeral expenses. Alexander Smith, a longtime friend of **MR. ALVAREZ**, writes that after he was diagnosed with lymphoma, **MR. ALVAREZ** was "an important part of [his] support system. . . . Alejandro offered to lend a hand . . . in any way he could."  Leslie Ramos, another longtime friend and Alexander's partner, recalls that without even being asked, **MR. ALVAREZ** would drive to bring them food during the COVID-19 pandemic, when she and Alexander had to take extra precautions due to Alexander's cancer diagnosis.  Catrina Rincon, one of **MR. ALVAREZ'S** best friends from FSU, writes that when she "struggled with depression[,] Alejandro gave me a place stay when I needed one, cooked me meals when I was too weak to eat," and helped her feel better.

In professional settings, too, **MR. ALVAREZ** has always found ways to help others. Belma Mejia, a former co-worker and friend, writes that **MR. ALVAREZ** served as a professional mentor and she has "Alejandro to thank for" helping her become "the most stable I've ever been." Kadian Allen Vernan, a former co-worker and friend, recalls that **MR. ALVAREZ** "pulled me away from moments of depression and anxiety" while she grieved the loss of her son.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

Even as **MR. ALVAREZ** prepared to enter the courtroom for his change of plea hearing, he was thinking first of others.  Mohamed Hamoud, **MR. ALVAREZ'S** brother-in-law, writes to the Court:

> Finally, the moment that sticks with me the most is the moment right before entering court for his plea hearing in June 2022. He pulled me and his sister's fiancé aside and asked us to take care of his sisters and mother while he is gone because they are all he worries about. Alejandro is a true example of a caring, selfless, and family-oriented man.

We respectfully request that this Court consider **MR. ALVAREZ'S** numerous acts of kindness and willingness to help those around him when determining his sentence.

### III.
### NATURE AND CIRCUMSTANCES OF THE OFFENSE

**MR. ALVAREZ** pleaded guilty to one (1) count of distribution of child pornography. He fully adopts the facts of the case as laid out in the Factual Proffer and the PSR.  The governing guidelines, § 2G2.2, provide for five (5) separate specific offense characteristic enhancements, resulting in a fifteen (15) level increase to **MR. ALVAREZ'S** base offense level of twenty-two (22).[15]  The Sentencing Commission and courts across the country have identified inherent issues with the child pornography guidelines, namely that the guidelines are outdated in their application to the modern technological world.[16]  As a

---

[15]     The following enhancements are contained in the Plea Agreement and PSR: two (2) point enhancement pursuant to § 2G2.2(b)(2); two (2) point enhancement pursuant to § 2G2.2(b)(3)(F); four (4) point enhancement pursuant to § 2G2.2(b)(4); two (2) point enhancement pursuant to § 2G2.2(b)(6); and five (5) point enhancement pursuant to § 2G2.2(b)(7)(D).

[16]     *United States v. Dorvee*, 616 F.3d 174, 186-87 (11th Cir. 2010) ("An ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction."); *United States v. Klear*, 3 F. Supp. 3d 1298, 1307 (M.D. Ala. 2014) ("[T]he problem with the non-production Guideline, U.S.S.G. § 2G2.2, is not that it should

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

result, enhancements that were intended for the worst cases of child pornography now apply in virtually all cases, failing to account for varying levels of culpability across defendants. That is precisely the case here, where **MR. ALVAREZ'S** guidelines are driven up fifteen (15) levels by enhancements that are uniformly applied in nearly all child pornography cases. Accordingly, we respectfully request that this Court consider the Sentencing Commission's criticisms of the child pornography guidelines and vary downward to account for the same.

In 2013, the Sentencing Commission issued a Report intended to contribute to Congress's assessment of the child pornography guidelines.[17] The 2013 Report highlighted, among other things, the following findings in support of its conclusion that the non-production guidelines needed revision: (1) the guidelines are outdated and disproportionate because they do not account for the use of modern technology; (2) the guidelines fail to account for involvement in child pornography communities and sexually dangerous behavior; (3) the guidelines are applied inconsistently which results in overly severe and unduly lenient sentencing ranges; and (4) an increasing number of courts are determining that the guidelines are not based on empirical data and therefore do not reflect the Commission's traditional institutional expertise.[18]

In 2021, the Sentencing Commission released a subsequent report, which updates

---

be more lenient in general, but rather that it fails to differentiate adequately among offenders and fails to reflect the actual culpability of behavior.").

[17] United States Sentencing Commission, SPECIAL REPORT TO CONGRESS: FEDERAL CHILD PORNOGRAPHY OFFENSES (Dec. 2012) (the "2013 Report").

[18] *Id.* at 10–13.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

and expands upon the 2013 Report.[19]  The 2021 Report first notes that Congress has not implemented the guidelines recommendations contained in the 2013 Report, and "as a result, judges have continued to sentence most non-production child pornography offenders below their guideline ranges, most often by imposing variances pursuant to 18 U.S.C. § 3553(a)."[20]  The Sentencing Commission explicitly stated that the purpose of the 2021 Report was to "provide Congress, judges, and other stakeholders with current information on non-production child pornography offenses and offender behavior."[21]

At the core of the Sentencing Commission's criticisms is the fact that the guidelines fail to account for advancements in technology and thus result in the application of enhancements in nearly all non-production cases.  For example, the guidelines provide for enhancements based upon the number of images.  § 2G2.2(b)(7).  The lower end of that provision provides for a two (2) level enhancement if the offense involved at least ten (10) images, but fewer than 150.  § 2G2.2(b)(7)(A).  The higher end of that provision provides for a five (5) level enhancement if the offense involved 600 or more images.  § 2G2.2(b)(7)(D).  Due to advancements in technology that allow for voluminous quantities of videos and images to be downloaded and shared, most non-production child pornography cases in 2019 involved thousands of images.  As a result, 77.2% of offenders in 2019 received an enhancement pursuant to § 2G2.2(b)(7)(D).[22]  Likewise,

---

[19]    United States Sentencing Commission, FEDERAL SENTENCING OF CHILD PORNOGRAPHY, NON-PRODUCTION OFFENSES (June 2021) (the "2021 Report").
[20]    *Id.* at 3.
[21]    *Id.* at 68.
[22]    *Id.* at 19.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

95% of offenders received an enhancement for computer, § 2G2.2(b)(6), and age of victim, § 2G2.2(b)(2), and 84% of offenders received an enhancement for depictions of sadistic or masochistic conduct or abuse of an infant or toddler, § 2G2.2(b)(4).[23]

These concerns are not new.  The Sentencing Commission has long addressed the dangers of the widespread application of the computer enhancement:

> Not all computer use is equal. Some uses lead to more widespread dissemination of child pornography and to increased accessibility of pornography and other sexually explicit dialogue to children. Sentencing policy should be sensitive to these differences in culpability so that punishments are tailored to fit the circumstances of each individual's crime.[24]

Courts have likewise criticized §2G2.2(b)(6)'s computer enhancement, reasoning:

> For example, someone who e-mails images to another (like the instant defendant) is not as culpable as someone who sets up a website to distribute child pornography to a large number of subscribers.  If the defendant did not use the computer to widely disseminate the images, use them to entice a child, or show them to a child, the purpose of the enhancement is not served.  Yet it applies in virtually all cases.

*United States v. Riley*, 655 F. Supp. 2d 1298, 1301 (S.D. Fla. 2009) (adopting Judge Adelman's analysis of §2G2.2(b)(6) and concluding that substantial deference to the recommended guideline range was not appropriate); *cf. United States v. Doktor*, No. 6:08-CR-46-ORL-31DAB, 2008 WL 5334121, at *1 & n.5 (M.D. Fla. Dec. 19, 2008) (criticizing "the Guideline because it was not based on empirical data or the sentencing expertise of the Commission").[25]

---

[23]      *Id.*

[24]      United States Sentencing Commission, REPORT TO CONGRESS: SEX OFFENSES AGAINST CHILDREN, at 29 (1996).

[25]      Transcript of Sentencing Hearing, *United States v. Barry K. Whaley*, Case No. 09-

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

In response to the widespread application of enhancements in typical non-production child pornography cases, courts have increasingly applied downward variances to account for high guidelines ranges.  In fact, in 2019, only 30% of non-production offenders received a sentence within the guidelines range.[26]  Courts in this district have accounted for the varying degrees of culpability through the use of downward variances because the widespread application of enhancements results in guidelines that no longer distinguish between more and less severe offenders.[27]

Here too, we ask this Court to consider the fact that the guidelines applications in **MR. ALVAREZ'S** case are driven by guidelines which the Sentencing Commission itself has criticized as being outdated and in desperate need of revision. *See United States v. Cubero*, 754 F.3d 888, 899 (11th Cir. 2014) (recognizing the district court's discretion to consider the 2013 Report when choosing an ultimate sentence).

---

20331-CR-MORENO (May 6, 2010).

[26]     2021 Report, *supra* note 21, at 5.

[27]     *See, e.g.*, *United States v. Diego Matrajt*, Case No. 12-cr-20343-RNS (varying downwards from guidelines of 210 – 262 months and imposing a sentence of 120 months); *United States v. Shawn Beauvais*, Case No. 12-cr-60067-RNS (varying downwards from guidelines of 151 – 188 months and imposing a sentence of 75 months); *United States v. Harrison Barrus*, Case No. 18-cr-60255-RNS (varying downwards from guidelines of 151 – 188 months and imposing a sentence of 75 months); *United States v. John Collier*, Case No. 18-cr-20095-PCH (varying downwards from guidelines of 97 – 121 months and imposing a sentence of 80 months); *United States v. Mael Crespin*, Case No. 18-cr-20250-KMW (varying downwards from guidelines of 97 – 121 and imposing a sentence of 65 months); *United States v. Gregory Rojas*, Case No. 15-cr-20997-DPG (varying downwards from guidelines of 151 – 188 and imposing a sentence of 60 months); *United States v. Taylor Lyon*, Case No. 15-cr-20893-UU (varying downwards from guidelines of 97 – 121 and imposing a sentence of 60 months); *United States v. Matthew Clark*, Case No. 11-cr-14064-DLG (varying downwards from guidelines of 151 – 188 and imposing a sentence of 66 months); *United States v. Nat Lane*, Case No. 10-cr-14061-JEM (varying downwards from guidelines of 151 – 188 and imposing a sentence of 108 months); *United States v. Mehrdad Sarlak*, Case No. 11-cr-20078-JLK (varying downwards from guidelines of 151 – 188 and imposing a sentence of 60 months).

## IV.
## UNWARRANTED SENTENCING DISPARITIES

18 U.S.C. § 3553(a)(6) "requires Judges to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Gall v. United States*, 552 U.S. 38, 51 (2007).  The United States Sentencing Commission's "Interactive Data Analyzer" ("IDA") is an online tool, which allows users to filter and customize the most up-to-date federal sentencing data based on a variety of factors including, fiscal year (2015-2021); geography (circuit, state, and district); defendant demographics (race, gender, age, citizenship, education); crime type; primary guideline (applicable guideline section of the Federal Sentencing Guidelines); sentencing zone; and criminal history.  After inputting the factors most relevant to **MR. ALVAREZ'S** case,[28] the IDA produced the following sentencing outcomes:

- <u>Distribution of Sentence Length</u>: 11% of the defendants were sentenced to a term of imprisonment of 24 months or less; 16.2% of the defendants were sentenced to a term of imprisonment of 24 to 59 months; 48.3% of the defendants were sentenced to a term of imprisonment of 60 to 119 months; and 24.5% of the defendants were sentenced to a term of imprisonment of 120 months or longer.

- <u>Average Sentence Length and Imprisonment Length</u>: 88 months.

- <u>Median Sentence Length and Imprisonment Length</u>: 72 months.

A copy of the sentencing outcome distribution charts produced by the IDA after inputting the sentencing factors are attached hereto and incorporated by reference herein as Exhibit № 3.   Consistent with the IDA's statistics, the Sentencing Commission

---

[28]   Fiscal Year: 2015-2021; Geography: National; Demographics: U.S. Citizen; Crime Type: Child Pornography; Primary Guidelines: § 2G2.2; Sentencing Zone: D; Criminal History: I.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

recognizes that "there has been a steady increase in the percentage of sentences imposed below the applicable guideline range in non-production child pornography cases, which indicate[s] that courts increasingly believe[] the sentencing scheme for such offenders [is] overly severe."[29]   Accordingly, we respectfully submit that a below guidelines sentence is warranted to avoid sentencing disparities.

## v.
## SUBSTANTIAL COOPERATION AND ACCEPTANCE OF RESPONSIBILITY

Consistent with MR. ALVAREZ'S acceptance of responsibility, he has expressed profound remorse for his actions and involvement in this offense.  *Smith v. Wainwright*, 664 F.2d 1194, 1196 (11th Cir. 1981) ("[E]xpression of remorse by one who acknowledges his violation of the law is often a significant first step towards his rehabilitation and, for that reason, deserving of a possible reward in the form of a lessened sentence.");  *Brady v. United States*, 397 U.S. 742, 753 (1970) (recognizing that a defendant who pleads guilty "demonstrates by his plea that he is ready and willing to admit his crime and to enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary").   Here, MR. ALVAREZ admitted to distributing child pornography within minutes of being arrested, and without the benefit of an attorney.[30]   At the time of his admission, MR. ALVAREZ was unaware that he was being arrested and questioned in

---

[29]     2021 Report, *supra* note 21, at 1.
[30]     Interview of MR. ALVAREZ at 17:50 (Jan. 10, 2022).  The first fifteen (15) minutes of the interview consist of the agents transporting MR. ALVAREZ to a safe location to conduct the interview and MR. ALVAREZ waiving his constitutional rights.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

relation to child pornography charges.

During his post-Miranda interview, **MR. ALVAREZ** voluntarily provided the agents with all the information he had of websites and forums where child pornography is accessible, as well as his use of those websites.  After identifying chats on his phone that contained child pornography, **MR. ALVAREZ** provided the agents with the passcode and consent to search his phone.  The agents were primarily interested in **MR. ALVAREZ'S** knowledge of individuals who produce child pornography or have access to children, and **MR. ALVAREZ** shared all the information he had.  **MR. ALVAREZ** disclosed that an individual with whom he had chatted admitted to physical contact with a minor, but the agents already possessed this information.  Moreover, **MR. ALVAREZ** identified a username in a chat application that belonged to another individual from California who had admitted to **MR. ALVAREZ** that he engaged in sexual acts with a minor.[31]  It wasn't until fifty (50) minutes into the interview that **MR. ALVAREZ** asked what was going to happen to him.[32]

Moreover, during his post-Miranda interview, the agents questioned **MR. ALVAREZ** about a teenage individual that he had referenced in his chats.  **MR. ALVAREZ** immediately recounted that when he himself was in his early twenties, he chatted with an individual via social media who **MR. ALVAREZ** believed to be eighteen (18).  With the understanding that this individual was eighteen (18), **MR. ALVAREZ** proceeded to meet the individual in person and have sexual relations with the individual.  Although **MR. ALVAREZ** remarked to the agents that, upon meeting the individual, this individual appeared to be younger than

---

[31]     The Government has represented that it has not located the individual.
[32]     Interview of **MR. ALVAREZ** at 50:48 (Jan. 10, 2022).

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

eighteen (18), age was not discussed during the interaction.  Several years later, **MR. ALVAREZ** reconnected with this individual through a dating application, on which this individual listed their age at that time as eighteen (18) or nineteen (19).  It is not known what this individual's true age was at either juncture.

After providing this information to the agents, **MR. ALVAREZ** stated that he had not knowingly engaged in physical contact with a minor, and then he proceeded to voluntarily recount a similar situation that occurred when he was about the same age—knowing that the agents did not possess any information about this instance.[33]  As **MR. ALVAREZ** revealed to the agents, he had physical contact with an individual who he believed to be an adult at the time.  Years later, **MR. ALVAREZ** came across this individual's profile on a dating application, which listed an age that was inconsistent with the age that the individual had previously provided to **MR. ALVAREZ**.  Once again, **MR. ALVAREZ** had no basis to know this individual's true age at either time.

Since his arrest, **MR. ALVAREZ** has developed a deep understanding and appreciation for the harm that results from the conduct of conviction.  He recognizes that child pornography is unacceptable, and that his actions resulted in the revictimization of children.  In this respect, he is committed to getting help and making amends for his actions.[34]  Mr. McCarthy writes that over the course of **MR. ALVAREZ'S** treatment:

> He consistently expressed profound sadness, regret, embarrassment and
> shame about the ways in which his actions would continue to impact

---

[33]     The point is not that **MR. ALVAREZ** had an opportunity to lie to the agents and chose not to, but that he was as forthcoming as possible with the agents.

[34]     Court-ordered therapists have represented that **MR. ALVAREZ** appears motivated to engage in treatment.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

> negatively on his family.  As catastrophic as were the consequences of his behavior to his current and future life, he always seemed more upset about the ongoing impact on his family rather than on himself.  *That is not to say that he didn't frequently express an understanding and deep regret about the nature of his behavior and its impact on the voiceless victims.*

Jacob Karr, his sister Cristina's fiancé, recalls: "often through tears, Alex articulated to me his profound remorse. He recognized the harm that the conduct he engaged in has for victims, children who need the full protection of the law and law enforcement."  As of the date of this filing, the Government has not identified any victims for purposes of restitution, but **MR. ALVAREZ** has nonetheless instructed his mother and sister to sell his car, his *only* substantial possession, to provide restitution in the event that victims are identified.[35]

In sum, **MR. ALVAREZ** provided as much information as he could to law enforcement, and his conduct since his arrest demonstrates that he takes full responsibility for his actions and recognizes the severity of his conduct.  We respectfully request that this Court consider the same when imposing a sentence.

**VI.**
**STRONG SUPPORT SYSTEM AND REHABILITATION**

**MR. ALVAREZ** has an unfailingly strong support system and he is committed to his rehabilitation, both of which support a downward variance in this case.  The Eleventh Circuit in *United States v. Clay*, 483 F.3d 739 (11th Cir. 2007), stressed that a sentencing court is "require[d] . . . to consider characteristics of the defendant and the offense that

---

[35]     *See* Transcript of Sentencing Hearing, *United States v. Martin Ebenhack,* Case No. 16-20869-CR-MORENO (May 17, 2017) (varying twenty-five (25) months to account for the defendant's service in the Navy and early restitution because "early restitution for someone who's not wealthy, but there's a little bit of money, is an indication of more than acceptance of responsibility") (Page 32, Lines 3–6).

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

make it more or less likely that the defendant will reoffend." *Id.* at 745. Courts and experts have identified a correlation between lower levels of recidivism and strong familial support.[36] In the instant case, **MR. ALVAREZ** has enjoyed the unwavering support and love from his family and friends from the very moment he was arrested. His two (2) sisters and their respective spouses uprooted their lives and relocated to Miami as soon as possible after **MR. ALVAREZ'S** arrest and subsequent criminal case.[37] Not a single court appearance or hearing has taken place without **MR. ALVAREZ'S** family sitting behind him.

Most indicative of **MR. ALVAREZ'S** strong support system are the many letters submitted on his behalf from friends and family, promising to this Honorable Court that they will be there for **MR. ALVAREZ** and hold him accountable during and after his incarceration. His sister, Jessica, writes that she is committed to seeing **MR. ALVAREZ** through these unfortunate circumstances, by being there for him through phone calls, emails, and visits. His sister Cristina did not hesitate to fund **MR. ALVAREZ'S** therapy sessions while he was on pre-trial release, and she writes that she is committed to helping him in every way moving forward. Jacob Karr, his sister Cristina's fiancé, promises the Court that he will assist **MR. ALVAREZ** in obtaining the right and best treatment. His

---

[36] Shirley R. Klein et al., INMATE FAMILY FUNCTIONING, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."); Phyllis J. Newton, Jill Glazer, & Kevin Blackwell, GENDER, INDIVIDUALITY AND THE FEDERAL SENTENCING GUIDELINES, 8 Fed. Sent'g Rep. 148 (1995) ("[T]he better family ties are maintained[,] the lower the recidivism rate.").

[37] This Court is aware of the lengths that **MR. ALVAREZ'S** sisters would go for him after witnessing their pleas and assurances to the Court that they would monitor **MR. ALVAREZ** if he was permitted to remain on bond pending sentencing. One of **MR. ALVAREZ'S** sisters even offered to move into **MR. ALVAREZ'S** home if the Court granted the request.

---

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

cousins Carlos and Patricia are ready to support **MR. ALVAREZ** mentally, emotionally, and in any other capacity to ensure his successful reentry into society.  **MR. ALVAREZ'S** other cousin, aunt, and uncle each have stood by **MR. ALVAREZ**, and they eagerly await his return.  Lastly, **MR. ALVAREZ'S** mother wrote to this Court:

> Our family will be there to support him. We will always have a stable, safe home for him to come home to. Your Honor, I implore that you please have leniency with Alejandro's sentencing so he can rebuild his life and pour out only love and goodness in the future.

In addition, virtually all of his friends have continued to support him and will be there for him upon his release.  For example, Brenna Kays writes that she looks forward to supporting **MR. ALVAREZ** on his path toward healing and atonement once he is free again.  Lizzeth Merchan, Esq., writes that "he is loved by many, including myself, and I know that he will continue to have this support system moving forward." And Genesis Cuesta, a treatment specialist and former probation officer, writes that **MR. ALVAREZ** is "blessed to have a community surrounding him with strength, understanding and support."

Moreover, **MR. ALVAREZ** has already begun to exhibit early signs of rehabilitation since his arrest.  For example, his sister Cristina emphasizes:

> Every week he was eager to attend multiple therapy sessions, and he remained sober the entire time he was on pre-trial release, even though he had abused alcohol and drugs for many years leading up to his arrest. . . . [H]e immediately began thinking of ways he could be productive during his time in prison.  He expressed hope that during his incarceration he would be able to complete his college education, obtain a productive job, and find ways to prepare for a life after prison.

Mr. McCarthy, LCSW, believes that over the course of **MR. ALVAREZ'S** treatment, he "appears to have come to understand the role that substance abuse played in inhibiting

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

his better judgment."  Mr. McCarthy sees "tremendous potential in him to learn from his mistakes, confront the demons of the past and marshal [h]is considerable strength, intelligence, kindness and empathy into a force for good, both for himself and for others."

Even while awaiting sentencing, **MR. ALVAREZ** is finding ways to help others in custody.  He is teaching several Spanish-speaking inmates at FDC Miami how to read, write, and speak in English.  **MR. ALVAREZ** volunteers as much as one (1) hour per inmate each day, using books that are available at FDC Miami.  **MR. ALVAREZ** is committed to making the most out of his term of imprisonment, which includes not only bettering himself, but also those around him.

Finally, **MR. ALVAREZ'S** experience with the criminal justice system is limited to the instant case.  For that, the PSR identifies that **MR. ALVAREZ** has zero criminal history points, which indicates the lowest risk of recidivism.  *United States v. Mogel*, 956 F.2d 1555, 1560 (11th Cir. 1992) ("The highest criminal history category, VI, is reserved for offenders with the highest risk of recidivism, while the lowest criminal history category, I, includes offenders with the lowest risk of recidivism.").  Indeed, Dr. Imhof opines that **MR. ALVAREZ** presents "a low risk for future offending and is a good candidate for treatment and community supervision."  Imhof at 8. With such interventions, Dr. Imhof states that "**MR. ALVAREZ** will present a negligible risk to the community."  *Id.*

We respectfully submit that **MR. ALVAREZ'S** strong support system, his clear ability to rehabilitate, and his low risk of recidivism supports a downward variance from the guidelines range.  *See United States v. Wachowiak*, 412 F. Supp. 2d 958, 964 (E.D. Wisc. 2006) aff'd 496 F.3d 744 (7th Cir. 2007) (varying downward from guidelines of 121–151

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

months and imposing a sentence of seventy (70) months in a child pornography case, noting that "the guidelines failed to account for the strong family support defendant enjoyed, which would aid in his rehabilitation and re-integration into the community. Because defendant's family and friends have not shunned him despite learning of his crime, he will likely not feel compelled to remain secretive if tempted to re-offend. Rather, he will seek help and support."). MR. ALVAREZ'S strong support system and earnest desire to rehabilitate ensure that a below guidelines sentence will serve to deter future criminal conduct and adequately protect the public.

### VII.
### CONDITIONS OF CONFINEMENT

> The trial judge cannot close his or her eyes to the conditions a particular defendant being sentenced will necessarily experience in prison. When a long term is fixed by statute, the prison environment must be considered by the sentencing judge in estimating total harm and benefits to prisoner and society – a utilitarian as well as a compassionate exercise. . . . Sentencing is not merely an announcement of judgment. It is a prediction and assumption of how the sentence will be carried out.

*United States v. D.W.*, 198 F. Supp. 3d 18, 24 (E.D.N.Y. 2016). We respectfully ask that this Court consider the conditions under which MR. ALVAREZ will serve a term of imprisonment in fashioning a sentence that is sufficient but not greater than necessary to achieve the goals of § 3553. Namely, we ask that this Court consider MR. ALVAREZ'S unique susceptibility to abuse in prison due to his: (1) homosexual orientation; (2) mental health diagnoses; (3) past history of abuse; and (4) sex offender status.

The U.S. Department of Justice has concluded that prisoners with any one of these characteristics experience abuse in prison at rates far greater than other prisoners:

(1) <u>Prisoners who identify as homosexual</u>: Inmates who reported their sexual orientation as gay, lesbian, bisexual, or other were among those with the highest rates of sexual victimization in 2011-12.[38]

(2) <u>Prisoners suffering from a mental health diagnosis</u>: Rates of inmate-on-inmate sexual victimization were two to three times higher among inmates who were taking prescription medications for their mental health or emotional problems at the time of the current offense than among inmates who were not taking such medications. Three to four times higher among inmates who had received mental health counseling or treatment from a trained professional in the past than among inmates who had not received such counseling or treatment.[39]

(3) <u>Prisoners with a history of abuse</u>: Among inmates who experienced sexual victimization before coming to the facility, 12.0% of prisoners and 8.3% of jail inmates reported being sexually victimized by another inmate at the current facility. An estimated 6.7% of prisoners and 5.1% of jail inmates who experienced sexual victimization before coming to the facility reported sexual victimization by staff.[40]

(4) <u>Prisoners convicted of a sex offense</u>: In 2011-12, inmates held for a violent sexual offense reported higher rates of inmate-on-inmate sexual victimization than inmates held for other offenses.  An estimated 3.7% of violent sex offenders in prison and 3.9% of violent sex offenders in jail reported being sexually victimized by another inmate in the last 12 months or since admission to the facility, if less than 12 months.[41]

**MR. ALVAREZ** belongs to *all* of these categories, making him particularly susceptible to

victimization. Further, Ms. Baird identifies **MR. ALVAREZ'S** HIV status as a characteristic

that "can also be stigmatizing in a prison setting." Baird Decl. ¶¶ 20, 30 ("These types of

illness can create a stigma or alienation from the general population of inmates due to

---

[38]     United States Department of Justice, SEXUAL VICTIMIZATION IN PRISONS AND JAILS REPORTED BY INMATES, at 7 (2012).

[39]     *Id.* at 25.

[40]     *Id.* at 19.

[41]     *Id.*; *see also, e.g.*, Alice Ristroph, *Sexual Punishments*, 15 Colum. J. Gender & L. 139, 159-60 (2006) ("[S]ex offenders are a distinct and disfavored category within prison populations, subject to heightened abuse from both correction officers and fellow inmates.").

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

prejudices or general misperceptions about contracting AIDS by close living conditions.").

Exacerbating the threat of abuse or victimization is the undisputed fact that BOP's "most common response to substantiated incidents of sexual victimization among inmates was to place the victim in administrative segregation or protective custody."[42]  *See id.* ¶ 24. Despite BOP's prevalent use of segregation and isolation to "protect" vulnerable inmates, substantial literature and studies continue to establish that solitary confinement can have devastating effects on individuals, including those with pre-existing mental health issues, that outlive a term of imprisonment.  *See United States v. D.W.*, 198 F. Supp. 3d at 93–94; Baird Decl. ¶¶ 27–28.[43]

Courts have taken into account the vulnerabilities of defendants like **Mr. Alvarez** in determining that a sentence was not greater than necessary.  *United States v. Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002) ("A defendant's unusual susceptibility to abuse by other inmates while in prison may warrant a downward departure.").  In *United States v. D.W.*, Judge Weinstein conducted a thorough examination of the defendant's personal characteristics that would expose him to far more onerous conditions of confinement when imposing the mandatory minimum sentence of fifteen (15) years.[44]  The court balanced the defendant's troubled past, which included repeated physical and sexual

---

[42]      United States Department of Justice, Sexual Victimization Reported by Adult Correctional Authorities, 2009-11, at 11 (Jan. 2014).
[43]      United States Department of Justice, Report and Recommendations Concerning the Use of Restrictive Housing (Jan. 2016).
[44]      The defendant plead guilty to one (1) count of possession of child pornography and one (1) count of sexual exploitation of a child.  The sentence imposed was a substantial downward variance from the defendant's guidelines of 292–365 months.

abuse from the day he was born, against the defendant's history of sexually deviant behavior with minors, which included state convictions for sexual abuse of minors and writing disturbing literature which contained fantasies of sexual encounters with minors:

> [W]hile defendant has been a sex abuser, he has lived most of his life as a victim.  He requires medical treatment and protection. The past sexual abuse he himself has suffered, together with the fact that he is gay or bisexual, has a mental illness and is a convicted sex offender, make him a prime candidate for victimization in prison, unless adequate, appropriate precautions are taken.  A sentence of fifteen years, without the protections suggested by the court, would likely be a condemnation to a decade and a half of unconstitutional physical, sexual, and psychological violence, as well as extended periods of debilitation solitary confinement. *Id.* at 55.

We respectfully submit that MR. ALVAREZ'S personal characteristics increase his chances of victimization in prison and should form part of this Court's analysis when imposing a sentence. As Ms. Baird concludes, "MR. ALVAREZ may endure unequal incarceration as compared to others who do not have MR. ALVAREZ'S unique combination of characteristics, including his medical conditions, mental health conditions, sexual orientation, history of abuse, and sex offense status." Baird Decl. ¶ 33.

### VIII.
### CONCLUSION

We respectfully request that this Court, after considering the factors outlined above, impose a sentence below the guideline range.

[Rest of Page Intentionally Left Blank]

Respectfully submitted,

**RABIN & LOPEZ, P.A.**
SunTrust International Center
One Southeast Third Avenue
Suite 2600
Miami, FL 33131
Tel: 305•358•1064
Email: sjr@miamilawyer.com

s/ *Samuel J. Rabin Jr.*

SAMUEL J. RABIN, JR.
Florida Bar № 273831

s/ *Jessica Duque*

JESSICA DUQUE
Florida Bar № 1031237

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of August 2022, a true and correct copy of the foregoing Sentencing Memorandum was furnished via the CM/ECF system to all parties designated to receive the electronic filings in this cause.

s/ *Samuel J. Rabin Jr.*
SAMUEL J. RABIN, JR.