UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff*<br><br>v.<br><br>ALEJANDRO ALVAREZ,<br><br>    *Defendant.* | Docket No: 22-cr-20030<br><br>**DECLARATION OF<br>MAUREEN P. BAIRD** |

## DECLARATION OF MAUREEN PATRICIA BAIRD

I, Maureen Patricia Baird, declare that the following statements are true:

### BACKGROUND OF DECLARANT

1. I currently work as a corrections consultant, specializing in federal corrections. I provide consulting services on all aspects of the federal prison system for private attorneys, Federal Defenders' Offices, individuals, and family members of those facing a possible federal prison sentence, or for those who have already been sentenced/incarcerated. I have prepared numerous declarations for attorneys and federal defenders within the United States. I have also prepared extensive reports regarding conditions of confinement in federal prisons for Barristers/Solicitors in England, Scotland, and Australia, who are preparing cases for possible extradition. During the last four years, I have provided expert witness testimony at several extradition hearings in the Westminster Magistrates' Court in

1

London, and the Edinburgh Sheriff Court in Scotland, regarding conditions of confinement in the Bureau of Prisons (BOP). I have also provided expert witness testimony in the United States District Court, Eastern District of Pennsylvania, concerning medical treatment/services available to inmates in federal prisons. I have previously been qualified as an expert witness in federal court in the areas of prison management, prison practices, and prison adjustment.

2. My career in adult male and female corrections spanned over 27 years with the Bureau of Prisons (BOP) in various capacities, with my final positions as Warden and Senior Executive Service Warden at three federal prisons which encompassed a variety of missions and programs.

3. My experience in federal corrections gives me both a technical ability to provide the Court an accurate assessment of an inmate's records, and to also put some context around those records.

4. I hold a Bachelor of Science degree in Justice and Law Administration and an Associate Degree in Criminal Justice, both of which I received at Western Connecticut State University. I completed many courses focused on federal inmates and corrections during my career with the BOP. A copy of my resume which includes my relevant work experience is attached to this report as Exhibit A.

5. I understand this report will be evidence that I would be prepared to give under oath, subject to any correction or qualification I may make before swearing to its veracity. I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are in my own knowledge I confirm to be true. The opinions I have expressed in this report, represent my true and complete professional

opinions on the matter to which they refer.

## STATEMENT OF WORK

6. I was contacted by Samuel Joseph Rabin, Jr., Rabin & Lopez, P.A., who is representing Alejandro Alvarez, a defendant whose case is pending sentencing in the Southern District of Florida. I reviewed the Presentence Investigation Report and medical information pertaining to Mr. Alvarez to provide my expert opinion on how a sentence of imprisonment would be carried out by the BOP considering Mr. Alvarez's unique combination of characteristics, including his medical conditions, mental health conditions, sexual orientation, history of abuse, and sex offense status within a prison environment.

## SUMMARY OF FINDINGS

7. A term of incarceration is difficult and not expected to be a pleasant experience for anyone. However, for those with a myriad of medical issues, like Mr. Alvarez, incarceration can be exponentially harsher. Mr. Alvarez's strict regimen of prescribed medications coupled with what I understand to be his fragile mental health will serve to complicate his time in prison.

8. His sex offense will also make his time in prison more difficult as many in the inmate population will ostracize him at a minimum or victimize him at an extreme. Sex offenders, particularly those with no criminal history, are particularly vulnerable to predators. In addition, his identification as a homosexual and his history of childhood sexual abuse will subject him higher risk of being violated.

9. In my opinion, he may undergo undue stress and an unequal incarceration as compared to others who do not have the health concerns or personal characteristics attributed to Mr. Alvarez.

## BUREAU OF PRISONS CLASSIFICATION AND DESIGNATION

10. The BOP classifies facilities into four categories which are Minimum (Camp), Low FCI, Medium FCI and High security (USP). Based on my analysis of Mr. Alvarez's security classification, he will score as Minimum Security but will receive a Public Safety Factor Sex Offender placing him in the next higher security level, Low. More information can be found in the BOP's policy.[1]

11. For most able-bodied inmates, the BOP attempts to designate offenders to a facility within 500 miles of the legal residence. Mr. Alvarez currently resides near Miami, FL, where low security prisons are available. Mr. Alvarez will likely be designated to one of the BOP facilities located in the southeast.

12. The BOP has a four-tiered system, and inmates are assigned a Care Level based on the level of physical and mental health care they require. Care Levels are One through Four, with Care Levels One and Two reserved for more healthy inmates, whose care can be handled within a standard BOP facility. I believe that Mr. Alvarez will be listed at Care Level Three based on his HIV status, blood-clotting issues and mental health. He will likely be sent to a Low FCI and not a Federal Medical Center.

## MEDICAL AND MENTAL HEALTH CARE IN A BOP FACILITY

13. Mr. Alvarez suffers from multiple medical and mental health conditions that will make his incarceration harsher than that of a healthier inmate. In particular, Mr. Alvarez's two

---

[1] Department of Justice, Federal Bureau of Prisons, CPD/CPB, Number P5100.08, *Inmate Security Designation and Custody Classification*, September 12, 2006.

4

autoimmune diseases (HIV and antiphospholipid syndrome), along with his diagnosed history of anxiety, depression, and panic attacks, are conditions that are difficult to properly treat in a community setting much less a prison setting.

14. Timeliness and proper dosage of medication is important for someone with Mr. Alvarez's medical needs. The BOP has a formulary of prescription drugs it dispenses to inmates. Those prescriptions that are listed on the BOP formulary are dispensed at certain times during "Pill Line." For those prescriptions not listed on the formulary, a substitute is often provided. If a substitute is not available and the specific medication is deemed medically necessary, a request from the institution Medical Director is submitted to BOP headquarters as an exemption to the formulary. It is my understanding that Mr. Alvarez experienced delays in receiving medication at FDC Miami, had his medication changed, has not seen a physician to address his autoimmune disorders, and has not had bloodwork since his being taken into custody. Any prescriptions Mr. Alvarez is taking at the time he enters federal custody would be reviewed to ascertain whether they are on the formulary and medically necessary. For those medications not listed, alternative medications would be substituted.

15. Mr. Alvarez may be unable to access regular medical appointments that he needs to ensure that his autoimmune disorders are properly managed. Undoubtedly, with his myriad of medical conditions, Mr. Alvarez will require specialty community medical appointments while serving his prison sentence. The enormous staff shortages the BOP is currently facing, which have been widely publicized and openly discussed by Congress

over the last year or more, could have a significant adverse impact on Mr. Alvarez's care.[2]

16. When scheduling specialty medical appointments in the community for inmates, significant planning amongst several departments within the respective prison is required. After the medical department schedules the appointment, the other departments, primarily correctional services, must plan for the escorted transport of the inmate. These medical appointments require one to two correctional officers to provide escort. Many times, for various reasons, these scheduled appointments are canceled on the day of the appointment. Recently, more than I have ever witnessed previously, lieutenants are mandating correctional officers to work overtime to cover correctional posts which cannot be left vacant. In the event of a vacant post, the officers who were scheduled for the escorted trip will be utilized for coverage, rather than resorting to mandatory overtime. The inmate's medical appointment will be canceled as a result. When this happens, inmates sometimes wait for extended periods before the medical specialist appointments are rescheduled.

17. Mr. Alvarez may be more susceptible to infectious diseases that regularly and easily spread within the confined prison setting. Inmates live in a dense population setting where spread of infectious disease has always been a concern, even prior to COVID-19 and the current spread of Monkeypox.[3] The *BOP Clinical Practice Guidelines for the Management of Methicillin-Resistant Staphylococcus Aureus (MRSA) Infections* provide

---

[2] *See, e.g.,* Camila DeChalus, *Federal Prison Working Conditions Are Getting Worse Despite Biden's Promise to Improve Conditions, Staffers Say* (Mar. 18, 2022), https://www.businessinsider.com/prison-workers-joe-biden-pandemic-covid-worse-doj-2022-3 ("About 6,200 Federal Bureau of Prisons employees left the agency from March 2020 to February 12, 2022, according to the Federal Bureau of Prisons. That translates to 8.7 employees departing every day during that time period.").

[3] *Prison Health Experts Are Worried About Monkeypox*, NPR (July 30, 2022), https://www.npr.org/2022/07/30/1114705987/prison-health-experts-are-worried-about-monkeypox.

recommendations for the prevention, treatment, and containment of these types of infections within federal prisons. Based on my 27-plus years of experience with the Agency, I understand these types of BOP policies are usually created, not as a proactive measure, but more reactive, mostly devoted to reaction after an outbreak has occurred. These written policies provide affirmation of the seriousness of the threat of infection and the need for limiting contagion as well as the challenges associated with contagious infections in a prison environment. MRSA and other similar infections often are the result of inmates sharing items such as communal facilities, weight equipment, telephones, computers, etc. It should be noted that much of the responsibility for controlling MRSA and such other infectious diseases, is the onus of the inmates who must be diligent about cleansing and disinfecting areas. As might be expected, inmates can sometimes fall short, creating a host of additional problems.

18. Regarding any inmate with weakened immunities, there are additional health concerns because of the very nature of a prison. In a prison setting, there are "high touch" areas where contagion of disease is a concern; toilets, showers, telephones (shared by multiple inmates each day) and computer terminals. These areas perpetuate the spread of germs and infection. During my career, I witnessed many outbreaks of MRSA, for example, at various institutions where I was assigned. For healthy inmates, the risks associated with contracting MRSA and other types of infections are not as troubling; however, for Mr. Alvarez, who requires a more sterile environment for many of his self-care needs, the risk of infection is much more serious.

19. Mr. Alvarez may be unable to receive consistent, individualized mental health care. Psychology Services Department staff in BOP facilities is limited, and staff members'

caseloads are exorbitant. Most of these professionals are committed to providing quality care to inmates; however, despite their best efforts, it is nearly impossible to provide individualized care on a regular basis in a federal prison setting.

## TREATMENT OF LGBTQ INDIVIDUALS AND SEX OFFENDERS

20. Mr. Alvarez will be substantially more vulnerable in prison because he identifies as homosexual, he is a survivor of childhood sexual abuse, he has a history of mental health issues, and he has been convicted of a sex offense. Having a disease like HIV in prison may also be stigmatizing because of other inmate prejudices against those with the disease based on general misperceptions about contracting AIDS by close living conditions.

21. The BOP closely monitors sexual abuse in prison and has an extensive policy statement dedicated to it.[4] Part of the policy states that the BOP conduct an intake screening to "assess inmates for risk of sexual victimization." Among those criteria are items that would identify Mr. Alvarez as susceptible to victimization, such as:

    a. Whether the inmate has previously been incarcerated
    b. Whether the inmate's criminal history is exclusively nonviolent
    c. Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming
    d. Whether the inmate has previously experienced sexual victimization
    e. The inmate's own perception of vulnerability

22. Because inmates who commence their prison sentences at higher security level prisons become eligible for transfers to lesser secure facilities, the prison population at Lows can

---

[4] Department of Justice Federal Bureau of Prisons, Program Statement 5324.12, *Sexually Abusive Behavior Preventtion and Intervention Program*, June 4, 2015, p. 29.

be comprised of aggressive and predatory inmates who prey on those who are most vulnerable or who are considered weak. Inmates for the most part are housed together and if an inmate feels threatened he will need to seek protection through placement in the Special Housing Unit (SHU), a process known as Protective Custody.

23. There are several reasons inmates are sometimes placed in SHU. This restrictive form of housing is comprised of two sections, administrative detention, and disciplinary segregation. Inmates are placed in this restrictive form of housing because of disciplinary infractions, internal prison investigations, protective custody, and a variety of other administrative reasons.

24. In my many years of working in federal prisons, it was not uncommon to witness inmates, who were openly gay, be removed from general population for protective reasons. There were times these individuals became victims of sexual predators and if staff became aware of an assault the inmate would be immediately placed in SHU for protection not afforded in the general population.

25. The reason SHUs are sometimes referred to as isolation or solitary confinement is because of the times when inmates are housed alone in a cell within these housing units. The SHU units are comprised of two person cells, although there are times when inmates are housed alone in the cell. While in SHU, inmates are restricted to the cell for 23-24 hours each day. Inmates are provided one hour of recreation a day, five days per week. Unfortunately, the provision for recreation may be set aside because of staff shortages, emergency situations at the institution, and other extenuating circumstances.

26. While assigned to the SHU, inmates receive one telephone call per month, ordinarily to a family member. Social visiting for inmates in SHU is also more restrictive than for

those in general population. In addition, there are a limited and restricted number of commissary items available for purchase by the inmate population residing in SHU. These items are limited for safety and security reasons.

27. There have been many studies, including one by the Department of Justice in 2016, on the physical mental effects of long-term isolation of inmates.[5] The issue has also been a part of legislative action to try to curb the use of the practice. Senator Dick Durbin introduced the *Solitary Confinement Reform Act in 2019*, to reduce the use of solitary confinement in prison. As recently as April 2021, Senator Durbin questioned the use of solitary confinement by the BOP stated during testimony of BOP Director Michael Carvajal, *"Even short periods in solitary confinement can cause inmates to suffer depression, lack of sleep, anger, and suicidal ideations – and to lose access to productive programming. As a result, the negative effects of solitary confinement can extend well beyond incarceration, making it more difficult for inmates to reintegrate into the general population and reenter society once their sentence has been served."*[6] I agree with Senator Durbin's assessment.

28. The cycle of using SHU for Protective Custody is a particularly difficult one for inmates and could last for extended periods. Fear of re-entering the general population can lead to an even longer placement in SHU or transfer to another prison.

29. In general, higher security facilities have a more predatory environment than that of the Minimum-Security level facilities. Newly arriving inmates are often vetted by other

---

[5] U.S. Department of Justice, *"Report and Recommendations Concerning the Use of Restrictive Housing,"* January 2016.
[6] *Durbin Questions BOP Director Carvajal on Use of Solitary Confinement*, U.S. Sen. Comm. on the Judiciary (Apr. 15, 2021), https://www.judiciary.senate.gov/press/dem/releases/durbin-questions-bop-director-carvajal-on-use-of-solitary-confinement.

inmates within the general population who are attempting to determine if a person is a cooperator or was involved in a sex offense involving minor children. This vetting process can be intimidating and has been problematic for the BOP to the extent that the BOP recently added a high severity prohibited act code to Program Statement 5270.09, Inmate Discipline Program (Change Notice dated November 18, 2020), Code 231- *"Requesting, demanding, pressuring, or otherwise intentionally creating a situation which causes an inmate to produce or display his own court documents for any unauthorized purpose to another inmate."* In my professional opinion, while this new infraction recognizes the problem, it has done little to minimize or discourage inmates, especially within the higher security level institutions, from demanding court transcripts or the court dockets citing the criminal charges. Inmates continue to confront other inmates when staff are not present, and it is unlikely other inmates would report such behavior for fear of being labelled a "rat." When inmates fail to produce these court records, they are at risk of being assaulted or require placement in protective custody. It is difficult to know how Mr. Alvarez, who has never been incarcerated, will react when confronted by this situation.

30. Mr. Alvarez's diagnosis of HIV can also be stigmatizing in a prison setting. Other inmates have means of finding out about a person's medical issues, especially with those who are HIV positive because they are barred from working in the food service department or they witness the type of medication inmates receive during the routine "pill line" regime. These types of illnesses can create a stigma or alienation from the general population of inmates due to prejudices or general misperceptions about contracting AIDS by close living conditions.

31. The BOP does not segregate inmates within a compound based on their instant offense. While co-conspirators or certain gang members may be separated between prisons or within a prison, there is no formal segregation by offense. However, within the social structure of inmates, sex offenders are often ostracized, eat alone or with others who have similar crimes and are usually not welcome to enter television rooms. They are also often excluded from certain recreational activities and, in extreme cases, assaulted and bullied. Having been assigned at various prisons of all security levels during my career with the BOP, I witnessed this treatment firsthand. No matter my best efforts to limit concerns related to this population, it was always difficult and concerning to successfully integrate sex offenders into general population in facilities where many sex offenders did not comprise the overall population or where a sex offender treatment program was not offered.

32. When someone who has a sex offense is threatened in prison, their only recourse is to ask to be placed into protective custody. The result can be an extended placement in solitary confinement and ongoing fear of reentering general population. When in protective custody, inmates miss out on continuity of connecting with family, inability to participate in meaningful programming, and the encounter the obvious stress of isolation.

## CONCLUSION

33. In my opinion, Mr. Alvarez may endure unequal incarceration as compared to others who do not have Mr. Alvarez's unique combination of characteristics, including his medical conditions, mental health conditions, sexual orientation, history of abuse, and sex offense status.

Signed on this 19th day of August 2022 by:

_____
Maureen P. Baird

EXHIBIT A

# Maureen P. Baird
# Professional Profile and CV

I currently work as a corrections consultant, specializing in the area of Federal Corrections. I have provided Expert Witness testimony in United States District Courts, at Sentencing Hearings for defendants who are facing a sentence of incarceration in the Federal System. I work as an independent Consultant and provide consulting services on all aspects of the Federal Prison System for private attorneys, Federal Defenders Offices and individuals and family members of those facing a possible federal prison sentence or those who have already been sentenced/incarcerated. I have prepared numerous Declarations for Attorneys within the U.S., and for Barristers/Solicitors in the United Kingdom, working on extradition cases. I have also provided Expert Testimony at Extradition Hearings in the Westminster Magistrates' Court in the UK regarding conditions of confinement in the Bureau of Prisons. My career in Adult Male/Female Corrections spanned 28 years with the Bureau of Prisons in various capacities, with my final positions as Warden and Senior Executive Service Warden at three Federal Prisons that encompassed a variety of missions and programs. I am an experienced Executive in Correctional Management with a demonstrated history of working in the law enforcement industry.

My experience in Federal Corrections began in 1989 as a case manager with the Department of Justice, Federal Bureau of Prisons. Throughout my 28 years with the Agency, I continued to acquire positions of increasing responsibility. In 2009, I was appointed to the position of Warden at the Federal Correctional Institution, Danbury, Connecticut, and was later promoted to Warden at the Metropolitan Correctional Center in New York City. There, I was appointed to Senior Executive Staff by the United States Attorney General and within two years, I was transferred to a position of greater responsibility as the Warden of the United States Penitentiary in Marion, Illinois. As warden, I was responsible for the leadership and direction of 300 to 350 staff members and approximately 1200 to 1500 inmates. During my tenure as warden for seven years, I was responsible for staff development and various specialized inmate housing units, including a high security management unit which mainly housed international terrorists who were assigned maximum custody. I led staff through a mission change at the Federal Prison in Danbury, where we had housed female offenders for several years and then transitioned to male offenders in 2013. I was also a member of the Joint Terrorist Task Force, and a member of various other federal, state, and local groups. I was very active with joint training that involved local, state, and federal law enforcement entities. For the last several years I have held Top Secret Clearance, only issued to a small percentage of Wardens and Executive Staff.

## Professional Experience
Warden Dec 2015 - Oct 2016
United States Penitentiary - Marion, IL
- Was CEO of an institution which housed 1500 medium/high security male offenders
- Supervised 350 staff members and a 40-million-dollar budget
- Oversaw the institution and staffing, inmate programs, institution security, staff training, staff and inmate investigations and discipline, policy and procedural changes, community relations, regular training on emergency preparedness

- Provided training to all institution staff during an annual refresher training for six to eight weeks
- Provided training to new hires regarding procedures, rules, and regulations, ethics and code of conduct requirements and both basic and advanced correctional duties

Warden Jun 2014 - Dec 2015
Metropolitan Correctional Center - New York City, NY
- Was CEO of a pre-trial federal prison which employed 350 staff and housed 700 all security level, pre-trial inmates and 150 low security sentenced offenders
- Performed all duties indicated above as warden at USP Marion, Illinois

Warden Oct 2009 - Jun 2014
Federal Correctional Institution - Danbury, CT
- Was CEO of an institution which employed 250 staff and housed 1200 female offenders
- Performed all duties indicated above as warden at USP Marion, Illinois, with an added emphasis on training geared toward female offenders

Correctional Institution
Administrator/Associate Warden Aug 2007 - Oct 2009
Metropolitan Detention Center - San Diego, CA
- Provided direction and leadership to 230 employees
- Assisted in the management of a mult-million dollar budget
- Oversaw high security/maximum custody pre-trial inmates and 200 low security sentenced inmates
- Ensured all mandatory internal and external security requirements were maintained and properly implemented
- Served on a forward-thinking workgroup focusing solely on future training trends
- Provided training on a regular basis to institution staff as well as other government agency staff
- Implemented several new proactive security measures which resulted in a more open form of communication between staff and inmates, thus allowing staff to find more contraband and providing a safer environment for staff and inmates
- Worked with union representatives to assist in resolving employee concerns as the Chairperson of the Labor Management Relations Board

Regional Correctional Programs Admin Feb 2005 - Aug 2007
Bureau of Prisons, Western Regional Office - Dublin, CA
- Oversaw 22 federal prisons located in the Western Region of the United States
- Primarily focused on the development and training of correctional programs staff who were employed by the individual facilities
- Orchestrated on-site training at the institutions, ensured the staff were familiar with policy, provided guidance, and compiled a report following each training
- Assembled a training manual for all new case managers to assist them in their duties
- Conducted regional training with all case management coordinators from the 22 institutions on an annual basis

- Was appointed to various after-action committees to investigate serious incidents that occurred at the prisons within the region
- Acted in the position of Regional Director and Deputy Regional Director multiple times
- Participated in and coordinated several Institution Character Profiles to evaluate programs and review security procedures at various institutions
- Recommendations made with regards to enhancing security or reorganizing programs.
- Was involved in the activation of all aspects of newly constructed federal prisons within the Western Region
- Coordinated a four-week online training session for case management coordinators to provide information/training on their new responsibilities through the merging of the Inmate Systems Department falling under their purview
- Received the Supervisor of the Year award from the Regional Director in June 2006

Correctional Institution
Administrator/Executive Assistant Aug 2000 - Feb 2005
Federal Correctional Institution - Schuylkill, PA
Assistant Correctional Programs Administrator Apr 1997 – Aug 2000
Bureau of Prisons, Northeast Regional Office – Philadelphia, PA
Case Management Coordinator Dec 1992 -Apr 1997
Federal Correctional Complex - Allenwood, PA
Assistant Parole Liaison Administrator Oct 1991 - Dec 1992
Mid-Atlantic Regional Office – Annapolis Junction, MD
Duty Station – U.S. Parole Commission – Chevy Chase, MD
Case Manager Mar 1989 – Oct 1991
Federal Correctional Institution - Danbury, CT
Federal Prison Camp – Nellis Air Force Base - Las Vegas, NV

Education
Western Connecticut State University - Danbury, CT
Bachelor of Science in Justice and Law Administration
May 1988
- Recipient of Justice and Law Administration Award of 1988 Activities
- Senior Executive Service Member
- Member of American Correctional Public Information Officer Association
- Member of Lion's Club
- Member of Association of Women Executives in Corrections
- Instructor/Trainer
- Volunteer for the American Cancer Society